IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ERICA LATRICE WELLS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO.  4:14-CV-00575-CAN |
| v. | § | |
| | § | |
| COMMISSIONER, SSA, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this appeal for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") pursuant to 42 U.S.C. § 405(g), denying her claim for disability and disability insurance benefits.  After carefully reviewing the Briefs submitted by the Parties, as well as the evidence contained in the administrative record, the Court finds that the Commissioner's decision should be **REMANDED**.

## BACKGROUND

### I.      PROCEDURAL HISTORY OF THE CASE

On September 6, 2011, Erica Latrice Wells ("Plaintiff") filed her application for social security disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"), alleging an onset of disability date of January 1, 2009 [TR at 185-86].[1]  Plaintiff's application was initially denied by notice on December 16, 2011 and again upon reconsideration on March 5, 2012, after which Plaintiff requested a hearing before an administrative law judge

---

[1] The ALJ mistakenly stated that Plaintiff's application was filed September 2, 2011 rather than September 6, 2011 [*compare* TR 8-30, *with id.* at 189].  Also, Plaintiff filed a previous application for DIB on July 1, 2010 that was denied on August 16, 2010, and again upon reconsideration on September 23, 2010.  *Id.* at 85-94.  The record contains functional reports, disability and work reports, and medical records collected as part of Plaintiff's July 1, 2010 DIB application and Plaintiff's September 6, 2011 DIB application [*see, e.g.*, TR 81-96, 205-241].

("ALJ"). *Id.* at 97-132. The ALJ conducted a hearing on January 28, 2013 ("Hearing"), and heard testimony from Plaintiff, Plaintiff's friend Joann Coleman ("Ms. Coleman"), and Vocational Expert Michael F. Gartman ("Vocational Expert").[2] *Id.* at 41-80. Plaintiff was represented by counsel at Hearing. *Id.* On March 12, 2013, the ALJ issued his decision denying benefits, and found Plaintiff not disabled at step four of the prescribed sequential evaluation process. *Id.* at 6-30. On April 17, 2013, Plaintiff requested that the Appeals Council review the ALJ's decision, and, on June 26, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. *Id.* at 1-5, 35. On September 4, 2014, Plaintiff filed a request for extension of time to file a civil action. *Id.* at 31-34.

On September 5, 2014, Plaintiff filed her Complaint [Dkt. 5]. On June 23, 2015, this case was assigned to the undersigned by consent of all Parties for further proceedings and entry of judgment [Dkt. 16]. Plaintiff filed her Brief on July 29, 2015 [Dkt. 19], and the Commissioner filed a Brief in Support of the Commissioner's Decision on October 28, 2015 [Dkt. 22]. The Court received the Administrative Record from the Social Security Administration ("SSA") on October 29, 2015 [Dkt. 23].

## II.    STATEMENT OF RELEVANT FACTS

### A.    *Age, Education, and Work Experience*

Plaintiff, born on March 7, 1975, was thirty-three (33) years of age at the time of her alleged onset date of January 1, 2009, and thirty-six (36) years of age at the time she filed her application [TR 9, 189]. Plaintiff graduated from high school and has a college degree in

---

[2] The ALJ may have misnamed Ms. Coleman in his opinion; the Hearing transcript refers to Plaintiff's friend by the name "Joann Comer" [*compare* TR 9, 21, *with id.* at 71]. In either case, it appears that ALJ intends to reference the same person. Additionally, the Hearing transcript refers to the Vocational Expert as "NAME NOT SPECIFIED" [*id.* at 74], while the ALJ's opinion refers to the Vocational Expert as Michael F. Gartman [*id.* at 9]. The Parties do not dispute that a vocational expert testified. The Court refers to such expert hereinafter as the "Vocational Expert."

electrical engineering. *Id.* at 46, 256. Plaintiff also pursued a master's degree in cross-cultural ministry, *id.* at 54, but did not complete her coursework. Plaintiff previously worked as a network/computer systems engineer. *Id.* at 22, 46. Plaintiff also briefly substituted as an English as a second language instructor and worked part-time from home placing internet advertisements. *Id.* at 54-57. Plaintiff's records and past work experience indicate that she can read and write in English. *See, e.g.*, *id.* at 54, 226.

### B.   *Medical Record Evidence*

Plaintiff claims the following impairments: Arnold-chiari malformation, syringomyelia, sleep apnea, and chemical imbalance/depression. *Id.* at 255. The ALJ found that Plaintiff also suffers from chronic pain, posttraumatic stress disorder, and somatization personality disorder, though Plaintiff did not claim these impairments. *See, e.g.*, *id.* at 12-13, 401, 410, 656-59, 712. The transcript in this case contains a significant number of medical records, including Plaintiff's own function reports,[3] medical reports filed in Plaintiff's previous DIB application,[4] and medical reports filed solely in Plaintiff's present application.[5] On appeal, Plaintiff primarily raises issues

---

[3] Plaintiff's function reports are self-reported accounts of Plaintiff's alleged impairments. The record contains three of these reports, one from Plaintiff's previous DIB application, dated July 14, 2010 [TR 218-25], and two filed in the present DIB application, one dated October 3, 2011, *id.* at 272-79, and one dated February 6, 2012, *id.* at 288-95.

[4] The record contains five medical reports from Plaintiff's previous DIB application: (1) treatment records from Dr. Shanan Munoz ("Dr. Munoz") dated July 11, 2007 [TR at 318-28]; (2) a psychiatric review technique from Dr. Mary Sullivan ("Dr. Sullivan") dated August 12, 2010, *id.* at 329-42; (3) a physical RFC assessment from Dr. Jeanine Kwun ("Dr. Kwun") dated August 16, 2010, *id.* at 343-50; (4) a medical evaluation/case analysis from Dr. John Dufor ("Dr. Dufor") dated September 17, 2010, *id.* at 351; and (5) a medical evaluation/case analysis from Dr. Cate Miller ("Dr. Miller") dated September 17, 2010, *id.* at 352. Each of these records reflects a medical opinion regarding Plaintiff's alleged impairments rendered on or before September 17, 2010.

[5] The record contains the following medical reports filed solely in Plaintiff's present application: (1) treatment records from Dr. Munoz dated May 15, 2008 to January 22, 2009 [TR 353-71]; (2) treatment records from Dr. Denise Bannister ("Dr. Bannister") dated January 7, 2008 to April 6, 2010, *id.* at 372-458; (3) emergency department records from Methodist Richardson Medical Center ("Methodist Richardson") dated November 4, 2005 to October 12, 2010, *id.* at 459-97; (4) treatment records from Richardson Primacare Medical Center ("Richardson Primacare") dated March 18, 2011 to May 15, 2011, *id.* at 498-513; (5) treatment notes from Joel Young, D.C. ("Dr. Young") dated March 23, 2010 to October 7, 2010, *id.* at 514-653; (6) a medical evaluation/case analysis from Dr. Roberta Herman ("Dr. Herman") dated October 24, 2011, *id.* at 654-55; (7) a clinical interview with mental status consultative examination report from Dr. Linda Ludden ("Dr. Ludden") dated November 14, 2011, *id.* at 656-60; (8) a psychiatric review technique from Dr. John Ferguson ("Dr. Ferguson") dated December 15, 2011, *id.* at 661-74; (9) a medical evaluation/case analysis from Dr. Tina Ward ("Dr. Ward") dated March 1, 2012, *id.* at 675-76;

related to the ALJ's purported disregard for the medical opinions regarding Plaintiff's alleged mental impairments. As such, the Court focuses its recitation and analysis hereafter on Plaintiff's alleged mental impairments (and the medical source opinions of record related to those impairments). The Court categorizes these opinions according to the Commissioner's regulations[6] as follows: (1) Treating Source Opinions, (2) Nontreating Source Opinions, and (3) Nonexamining Source Opinions.

### 1. *Treating Source Opinions*

The record contains medical opinions concerning Plaintiff's alleged mental impairments from three treating sources: Drs. Munoz, Bannister, and Phillips. Dr. Munoz's treatment records dated July 11, 2007 to December 17, 2009 are the earliest treating source opinions reflected in the record [*see* TR 318-28]. These treatment records only reflect Dr. Munoz's opinion that, on December 17, 2009, Plaintiff had "no depression, anxiety, or agitation." *Id.* at 318.

Dr. Bannister's records regarding Plaintiff's mental impairments are more expansive. *See id.* at 372-458. Dr. Bannister reported on April 16, 2009 that Plaintiff "feels like the grieving [over her recently deceased mother] is draining her energy but all in all, she doesn't feel like she is having a lot of trouble with depression." *Id.* at 389. On May 14, 2009, Plaintiff reported to

---

(10) a psychiatric review technique from Dr. Robert Gilliland ("Dr. Gilliland") dated March 1, 2012, *id.* at 677-90; (11) treatment records from Dr. Allison Wyll ("Dr. Wyll") dated July 3, 2008 to July 22, 2008, *id.* at 691-94; (12) treatment records from Dr. Munoz dated April 7, 2011 to September 27, 2011, *id.* at 695-704; (13) treatment records from Dr. Young dated March 16, 2012 to April 27, 2012, *id.* at 705-09; (14) a clinical interview and mental status examination from Dr. George Mount ("Dr. Mount") dated October 15, 2012, *id.* at 710-42; (15) treatment records from Dr. Bruce Phillips ("Dr. Phillips") dated May 28, 2010 to November 2, 2012, *id.* at 743-48; (16) treatment records from Dr. Phillips dated December 10, 2012, *id.* at 749; (17) progress notes from Dr. Phillips dated November 2, 2012 to December 3, 2012, *id.* at 750; and (18) treatment records from Dr. Young dated November 16, 2012 to January 18, 2013, *id.* at 751-56.
[6] The Commissioner has identified three main types of sources based upon the source's relationship with the claimant: (1) treating sources—those who generally "have an ongoing treatment relationship" with the claimant— (2) nontreating sources—those who "ha[ve] examined [the claimant] but do[] not have, or did not have, an ongoing treatment relationship with [the claimant,]" such as a consultative examiner—and (3) nonexamining sources—those who "ha[ve] not examined [the claimant] but provide[] a medical or other opinion[,]" such as a state agency consultant. 20 C.F.R. § 404.1502. The Court recites the relevant opinions under each of these categories, then recites the relevant information from Plaintiff's own functional reports.

Dr. Bannister that Plaintiff was "doing better" and that "the grieving is proceeding as well as can be expected." *Id.* at 392. On September 16, 2009, however, Dr. Bannister reports variously that Plaintiff feels "she has . . . no focus[,]" that "[s]he doesn't necessarily get dressed[,]" that "[s]he does minimal activities[,]" and that "[s]he [was] not functioning outside of the bare minimum." *Id.* at 401. Dr. Bannister "inched up [Plaintiff's] Lexapro to 15mg" in response and reported that, at Plaintiff's next visit on November 6, 2009, Petitioner felt "she [was] definitely doing better" and "attribute[d] some of that to the medication . . . [and some to] grief counseling with her pastor in a group setting [as well as] working with others." *Id.* at 404. On April 6, 2010, just after the anniversary of Plaintiff's mother's death, Dr. Bannister reported that Plaintiff "had suicidal thoughts" but "now feels brighter about things." *Id.* at 413. Further, Dr. Bannister noted that Plaintiff felt "the Lexapro is definitely working and doesn't want to change anything." *Id.*

Dr. Phillips began treating Plaintiff in May 2010 and treated Plaintiff thereafter for over two years. *Id.* at 744-49. Over the course of his treating Plaintiff, Dr. Phillips noted Plaintiff's fatigue, depression, and lack of motivation, as well as his prescription of several different pharmaceutical drugs. *Id.* at 745, 748. Dr. Phillips records reflect that Plaintiff was depressed from May 2010 into late October 2012. *Id.* Dr. Phillips concluded in his December 2012 progress notes that Plaintiff is "severely depressed" and suffers from other serious impairments, which together leave Plaintiff "unable to perform even minimal duties of a job for any extended period of time." *Id.* at 749.

### 2. *Nontreating Source Opinions*

The record also contains medical opinions concerning Plaintiff's alleged mental impairments from three nontreating sources: Methodist Richardson, and Drs. Ludden and Mount. The Methodist Richardson emergency department records document Plaintiff's treatment

following a car wreck in which Plaintiff was involved on October 11, 2010. *Id.* at 462. These records offer limited information about Plaintiff's alleged mental impairments and provide only that Plaintiff was "awake, alert and cooperative with an affect that is calm" on October 12, 2010, the day after her car wreck. *Id.* at 461.

Dr. Ludden's records derive from Plaintiff's clinical history data, a functional assessment gathered by a mental health provider, and a mental status exam administered by Dr. Ludden on November 14, 2011. *Id.* at 659. Dr. Ludden reported that Plaintiff wore clean, appropriate clothes and that "[h]er hygiene was good and her grooming . . . average." *Id.* Plaintiff "appeared alert throughout the interview" and "presented as fairly cooperative[,]" as well. *Id.* Dr. Ludden recorded that Plaintiff reported difficulties in daily living activities and that Plaintiff reported "having few friends[,]" although Plaintiff "acknowledged getting along well with others." *Id.* at 657. Dr. Ludden observed during the mental status examination that Plaintiff "maintained poor eye contact[,]" that "her tone [of voice] was nervous and depressed[,]" and that "[h]er mood was very depressed." *Id.* at 658-59. Dr. Ludden also observed that Plaintiff displayed a "logical and goal-oriented" thought process, "denied delusional thoughts" and auditory or visual hallucinations, "was oriented to person, place, time, and situation[,]" had satisfactory short-term and remote memory, and either made no mistakes during or completed on the first attempt the concentration tests she was asked to complete. *Id.* at 658. Dr. Ludden concluded that "[Plaintiff's] prognosis [was] poor" and that "[a]dditional stressors such as trying to maintain employment [would] only make her conditions worse." *Id.* at 659. Dr. Ludden diagnosed Plaintiff with Major Depressive Disorder, Recurrent, Severe Without Psychotic Features as well as Adjustment Disorder, Chronic, With Anxiety. *Id.*

Dr. Mount's records derive from Dr. Mount's review of Plaintiff's medical records as well as his interviewing and testing of Plaintiff. *Id.* at 710. Dr. Mount reported that "[Plaintiff] was punctual . . . was casually attired and grooming was good" for her interview. *Id.* Plaintiff, Dr. Mount reported, "spends most days at home[,]" has difficulty "attend[ing] to household chores and grocery shop[ping,]" and "does not socialize much outside her home" although "[s]he goes to church." *Id.* at 711. Further, Dr. Mount observed that Plaintiff's "[b]ehavior was lethargic[,]" that Plaintiff "report[ed] suicidal thoughts[,]" that her "[a]ffect was depressed and mood was labile" with "low energy level and [feelings of] worthless[ness.]" He reported that Plaintiff's "prognosis [was] guarded" and diagnosed Plaintiff with Major Depressive Disorder, Recurrent, Severe without Psychotic Features, Posttraumatic Stress Disorder, Chronic, Somatization Disorder,[7] and Borderline Personality Disorder. *Id.* at 712. In completing his psychiatric review technique report, Dr. Mount rated Plaintiff's function limitations as a result of Plaintiff's mental impairments as "marked," indicated that Plaintiff had suffered "one or two" episodes of decompensation, each of extended duration, and found Plaintiff's mental impairments of listing-level severity. *Id.* at 726-42.

### 3. *Nonexamining Source Opinions*

In addition, the record contains medical opinions concerning Plaintiff's alleged mental impairments from four nontreating sources, Drs. Sullivan, Miller, Ferguson, and Gilliland. On August 12, 2010, Dr. Sullivan completed her psychiatric review technique report covering the time period June 2, 2009 to August 12, 2010. *Id.* at 329-42. Dr. Sullivan indicated that Plaintiff had "depression," and noted that this "medically determinable impairment [did] not precisely satisfy the diagnostic criteria" under Listing 12.04, as well as that a "Coexisting Nonmental

---

[7] It appears that only Dr. Mount identified and/or opined on Plaintiff's alleged somatization disorder. *Compare* [TR at 712, *with* TR at 329 (report of Dr. Sullivan), 661 (report of Dr. Ferguson), 677 (report of Dr. Gilliland)).

impairment(s) that Requires Referral to Another Medical Specialty" existed. *Id.* She noted no other mental impairments. *Id.* Dr. Sullivan rated Plaintiff's difficulties in maintaining concentration, persistence, or pace as mild, and found no restriction of activities of daily living, difficulties in maintaining social functioning, or episodes of decompensation of extended duration. *Id.* Dr. Sullivan noted that Plaintiff was being treated by her primary care physician with Lexapro, responding well to medication with one episode of suicidal ideation in March 2010, was not delusional or irrational, had bright affect, followed directions well, handled stress well and could tolerate a change in routine, and there was no other psychological treatment or any evidence of severe mental health issue. *Id.* Dr. Sullivan opined that "current evidence suggests a mild disease process with no evidence of a severe mental impairment. Allegations are not fully supported by [evaluation of record]." *Id.* On September 17, 2010, Dr. Miller completed a recon affirmation of Dr. Sullivan's report. *Id.* at 352. Dr. Miller noted no new mental health allegations, that Plaintiff had not returned for medical care, and that Plaintiff had some limitations on function due to depression but not any marked, ongoing limitations. *Id.* Dr. Miller affirmed Dr. Sullivan's report and opinions in full. *Id.*

On December 15, 2011, Dr. Ferguson completed his psychiatric review technique report covering the period January 1, 2009 to December 13, 2011. *Id.* at 661-74. Dr. Ferguson indicated that Plaintiff had "MDD [major depressive disorder], adjustment disorder," and noted that this "medically determinable impairment [did] not precisely satisfy the diagnostic criteria" under Listing 12.04. *Id.* Dr. Ferguson noted no other mental impairments. *Id.* Dr. Ferguson rated Plaintiff's difficulties in maintaining concentration, persistence, or pace, restriction of activities of daily living, and difficulties in maintaining social functioning as moderate, and noted no episodes of decompensation of extended duration. *Id.* Dr. Ferguson opined that

Plaintiff had no "hx [history] of any mental issues," and noted that Plaintiff denied delusional thoughts, excessive anxiety, presence of specific phobias, compulsive thoughts/behaviors, obsessive thoughts, suicidal ideation, homicidal ideation, that Plaintiff's mood was very depressed, her affect was appropriate with average intelligence, satisfactory remote memory and judgment, and the presence of a low GAF without significant limitations. *Id.* Dr. Ferguson also noted Plaintiff's activities of daily living included cooking ability, care for daily needs and household chores, ability to handling money and banking, to live alone, and to shop in stores and go out alone. *Id.* He reported no problems with memory, completing tasks, understanding, getting along with others, or following instructions. *Id.* Dr. Sullivan opined that "[Plaintiff's] depression [was] mostly brought on by physical condition" and that Plaintiff's mental impairments were not severe. *Id.*

On March 1, 2012, Dr. Gilliland completed his psychiatric review technique report covering the period January 1, 2009 to March 1, 2012. *Id.* at 677-90. Dr. Gilliland indicated that Plaintiff had Major Depressive Disorder, Adjustment Disorder, a "medically determinable impairment present that does not precisely satisfy the diagnostic criteria" under Listing 12.04, and "Coexisting Nonmental impairment(s) that Requires Referral to Another Medical Specialty." *Id.* He noted no other mental impairments. *Id.* Dr. Gilliland rated Plaintiff's difficulties in maintaining concentration, persistence, or pace, restriction of activities of daily living, and difficulties in maintaining social functioning as mild, and noted no episodes of decompensation of extended duration. *Id.* Dr. Gilliland noted that Plaintiff has "no hx [history] of mental tx [treatment,]" that "multiple sources did not indicate presence of any significant mental c/o's [complaints,]" and that mood was depressed but otherwise mental status examination was

unremarkable. *Id.* Dr. Gilliland opined that "alleged limitations are not fully supported by the EoR [evidence of record]" and Plaintiff's impairments are not severe. *Id.*

### 4. Plaintiff's Functional Reports

The record contains three functional reports completed by Plaintiff from July 14, 2010, October 3, 2011, and February 6, 2012. *Id.* at 218-25, 272-79, 288-95. On July 14, 2010, Plaintiff stated she prepared only frozen dinners, employed a yard service for mowing, had trouble driving sometimes, and could tolerate trips to the grocery store for necessities of approximately one hour in duration. *Id.* at 218-25. Plaintiff indicated she attended church weekly (subject to her health), had people over to the house to eat or watch a movie, and went to doctor's appointments. *Id.* Plaintiff described no problems with personal care, medication side effects, following written and spoken instructions, or handling money. *Id.*

On October 3, 2011, Plaintiff reported difficulties with personal care. *Id.* at 272-79. In particular, she pointed to her practice of not getting dressed unless necessary to leave the house for appointments or school, problems showering and combing hair due to pain and tiredness, and skipping meals due to fatigue. *Id.* Plaintiff described preparing frozen dinners and snack foods like nuts and cereal, doing laundry when necessary (no folding), going grocery shopping for short periods for necessities once a week or as needed, and vacuuming with frequent breaks every three weeks or more. *Id.* Plaintiff described watching TV and movies at home, talking with friend(s) via phone, attending one class, and going to church when she is able to drive. *Id.* Plaintiff stated she is unable to do yardwork and pays a service to complete such tasks. *Id.* Plaintiff stated she has drowsiness, fatigue, and insomnia side effects with her medications, and can no longer afford her medications due to lack of insurance. *Id.* Plaintiff noted she had no

problems with written and spoken instructions, getting along with other people, and handling money. *Id.*

On February 6, 2012, Plaintiff indicated similar personal care difficulties as those she had reported on October 3, 2011, and stated she "may go as long as six weeks without washing [her] hair." *Id.* at 288-95. Plaintiff stated she did laundry every three weeks, vacuumed (with frequent rests) monthly or less frequently, talked with a friend once a week via phone, went to church when her health permitted, and went to class once a week. *Id.* Plaintiff described difficulties with concentration and short term memory, but no problems with handling money, following written instructions, or getting alone with authority figures. *Id.*

### C. *Hearing Testimony*

#### 1. *Plaintiff's Testimony*

At Hearing, Plaintiff testified that she has a college degree in electrical engineering and most recently was attending classes at Dallas Theological Seminary. *Id.* at 45-58. Plaintiff stated that she was taking one class per semester, but took a leave of absence after Spring 2012 due to her impairments and difficulty driving. *Id.* Plaintiff further testified that she was diagnosed with Arnold-chiari malformation and syringomyelia when she was twenty-three years old (though she had been symptomatic since her early teenage years), suffered significant nerve damage from these conditions, and underwent surgery to help correct these conditions on April 3, 2000. *Id.* at 50. Plaintiff explained that she has "pains that shoot through the fingers"— such that she cannot write a one-page letter—and "would have spasms [causing her] inability to walk; headaches that would actually take me down to the ground;" and has tinnitus (ringing in the ears), slurred speech caused by tongue swelling, concentration problems, depression, and sleep apnea. *Id.* Plaintiff indicated that her symptoms started to affect her work performance in

2007, that she exhausted all of her sick days and vacation days for sick leave due to her impairments, and that she was laid off in May 2008 due in part to poor job performance caused by her physical symptoms. *Id.* at 48-49. Plaintiff testified that her symptoms, particularly from her depression, became significantly worse after her mother, whom she was caring for, passed away in March 2009. *Id.* at 51, 58

Plaintiff reported that she completed some limited work as a substitute English as a second language teacher in 2011 for approximately eight hours per week, and in strategically placing internet advertisements on blogs in 2012 for a couple hours per week. *Id.* at 54-57. Plaintiff testified, as well, that she lives alone in a house, completes some limited cleaning and indoor household chores when her condition permits it, and goes to the grocery store for necessities, though she often needs to use the store scooter and/or lean on a cart for support. *Id.* at 45, 64-65. Plaintiff reports that her friend Ms. Coleman, and others at her church, assist her frequently with cleaning, driving, and also her mortgage and medical bills. *Id.* at 64-65 Plaintiff states that she sometimes sings in the choir at church, but that her ability to attend practices and sing at required services is unpredictable and significantly limited due to her impairments. *Id.* at 66-67. Plaintiff further testified that she gets tired easily, and rarely engages in social interaction besides speaking on the phone with her friend Ms. Coleman and attending church and/or choir sporadically. *Id.* at 69-70.

### 2. *Witness Testimony*

Ms. Coleman also testified at Hearing. *Id.* at 71-74. Ms. Coleman described first a "pain episode" that Plaintiff had just prior to entering Hearing: Ms. Coleman testified that Plaintiff "tensed up[,] . . . was unable to move[, and] was in physical pain, tears[,]" lying on the floor for about ten to fifteen minutes. *Id.* at 72-73. Ms. Coleman testified further that she has seen such

episodes often, and that she often "cleans house for [Plaintiff]" and drives Plaintiff to locations Plaintiff needs to go. *Id.* at 73. Finally, Ms. Coleman testified to Plaintiff's mental status; she stated: "I never know if this time will be the last time that I get to talk to her [(Plaintiff)]. There have been plenty of nights where she's told me that she's not going to make it through the night, crying. It's generally a – it's usually a depressive type." *Id.* at 74.

### 3. *Vocational Expert Testimony*

Michael F. Gartman ("Vocational Expert") testified as a vocational expert at Hearing. *Id.* at 9, 74-77. The ALJ asked the Vocational Expert to describe Plaintiff's work history, and the Vocational Expert responded that Plaintiff had past relevant work experience as a computer systems engineer (network engineer) (sedentary, Special Vocational Preparation ("SVP") of 7, DOT of 033.167-010). *Id.* at 74. The ALJ then asked the Vocational Expert a hypothetical question incorporating Plaintiff's age, work history, and education, assuming the hypothetical individual suffers from daily pain with such "persistence and intensity" that "she would miss . . . over two hours [of work] a day even at the sedentary level." *Id.* at 75. The ALJ asked the Vocational Expert if such hypothetical individual could perform Plaintiff's past relevant work or any work in the national economy, and the Vocational Expert answered in the negative. *Id.* Next, the ALJ asked the Vocational Expert a second hypothetical question incorporating Plaintiff's age, work history, and education, assuming that "due to major depressive disorder, post-traumatic stress disorder, and a . . . somatoform disorder . . . had the following limitations: . . . chronic pain; . . . marked restriction in her activities of daily living; . . . marked restriction in social functioning; and . . . marked restriction in concentration, persistence, or pace." *Id.* at 75-76. The ALJ asked the Vocational Expert if the hypothetical individual could perform Plaintiff's past relevant work or any work in the national economy, and the Vocational Expert answered in

the negative. *Id.* The ALJ then asked the Vocational Expert a third hypothetical question incorporating Plaintiff's age, work history, and education, assuming the hypothetical individual was limited to performance of "simple, one- to two-step instructions learned within 30 days or less, usually by repetition[,]" and "limited to work where she could sit six out of eight hours, stand two out of eight hours, and lift up to . . . 20 pounds." *Id.* at 76. The ALJ asked the Vocational Expert if Plaintiff could perform any other type of work in the national economy after acknowledging that such hypothetical individual would be unable to perform Plaintiff's past relevant work with such limitations, and the Vocational Expert answered affirmatively, noting that such hypothetical individual could perform the following jobs: (1) addressor (sedentary, DOT 209.587-010, SVP of 2, nationally 25,000, state of Texas 1,100); (2) charge account clerk (sedentary, DOT 205.367-014, SVP of 2, nationally 33,000, state of Texas 2,900; and (3) lens inserter (sedentary, DOT 713.687-026, nationally 28,000, state of Texas 1,500). *Id.* at 76-77. The Vocational Expert also added that the hypothetical individual could perform the jobs of addressor, charge account clerk, and lens inserter with the additional limitation of only frequent use of both upper extremities, and that Plaintiff could perform the full range of sedentary work under hypothetical three. *Id.* at 77.

## III. FINDINGS OF THE ALJ

### A. *Sequential Evaluation Process*

Pursuant to the statutory provisions governing disability determinations, the Commissioner has promulgated regulations that establish a five-step process to determine whether a claimant suffers from a disability. 20 C.F.R. § 404.1520. First, a claimant who is engaged in substantial gainful employment at the time of his disability claim is not disabled. 20 C.F.R. § 404.1520(b). Second, the claimant is not disabled if his alleged impairment is not

severe, without consideration of his residual functional capacity, age, education, or work experience. 20 C.F.R. § 404.1520(c). Third, if the alleged impairment is severe, the claimant is considered disabled if his impairment corresponds to a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). Fourth, a claimant with a severe impairment that does not correspond to a listed impairment is not considered to be disabled if he is capable of performing his past work. 20 C.F.R. § 404.1520(e). Finally, a claimant who cannot return to his past work is not disabled if he has the residual functional capacity to engage in work available in the national economy. 20 C.F.R. § 404.1520(f). Under the first four steps of the analysis, the burden lies with the claimant to prove disability and at the last step the burden shifts to the Commissioner. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007). If at any step the Commissioner finds that the claimant is or is not disabled, the inquiry terminates. *Id.*

### B.    ALJ's Disability Determination

After hearing testimony and conducting a review of the facts of Plaintiff's case, the ALJ made the following sequential evaluation. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2009, and that any work done after then had not constituted substantial gainful activity. [TR at 11]. The ALJ also found that Plaintiff met the earnings requirement of the Act through March 31, 2014. *Id.* At step two, the ALJ determined that Plaintiff had the following severe impairments: Arnold-chiari malformation, syringomyelia, chronic pain, major depressive disorder, posttraumatic stress disorder, and somatization personality disorder. *Id.* at 12. At step three, the ALJ found that these impairments, singly or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 11-15. He evaluated the impairments he found were severe against the Listings for Major Depressive Disorder (12.04)

and Posttraumatic Stress Disorder (12.06). *Id.* at 13. The ALJ indicated that he considered the Listing for Somatization Disorder (12.07), but cited to the Listing for Personality Disorders (12.08). In any case, he determined that none of the alleged impairments, either singly or in combination, met the "Paragraph B" criteria, which are identical for each of the 12.04, 12.06, 12.07, and 12.08 Listings. *Id.* at 13-14; *see* 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ then found that Plaintiff had the residual functional capacity to perform sedentary work limited to simple, one to two step instructions, learned within 30 days or less usually by repetition, and where she could sit six out of eight hours, stand two out of eight hours, and lift only up to 20 pounds [TR at 15-21]. In making this finding, the ALJ systematically discredited the following medical opinions, noting that he gave each "little weight" in his analysis: (1) Drs. Sullivan and Miller (nonexamining), (2) Dr. Ferguson (nonexamining), (3) Dr. Gilliland (nonexamining), (4) Dr. Ludden (nontreating), (5) Dr. Mount (nontreating), (6) Dr. Kwun (nonexamining), and (7) Dr. Phillips (treating). *Id.* at 19-21. At step four, the ALJ determined that Plaintiff was unable to perform her past relevant work as a computer systems engineer. *Id.* at 22. The ALJ found at step five that Plaintiff's residual functional capacity allowed her to perform a range of sedentary work in the national economy, including work as an addressor, charge account clerk, and/or lens inserter. *Id.* at 23. Based on this determination, the ALJ concluded Plaintiff was not disabled from January 1, 2009 to March 12, 2013. *Id.*

## STANDARD OF REVIEW

In an appeal under § 405(g), the Court must review the Commissioner's decision to determine whether there is substantial evidence in the record to support the Commissioner's factual findings and whether the Commissioner applied the proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).

Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). This Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995). Additionally, any conflicts in the evidence, including the medical evidence, are resolved by the ALJ, not the reviewing court. *Carry v. Heckler*, 750 F.2d 479, 484 (5th Cir. 1985).

The legal standard for determining disability under Titles II and XVI of the Act is whether the claimant is unable to perform substantial gainful activity for at least twelve months because of a medically determinable impairment. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see also Cook*, 750 F.2d at 393. "Substantial gainful activity" is determined by a five-step sequential evaluation process, as described above. 20 C.F.R. § 404.1520(a)(4).

## ANALYSIS

Plaintiff raises two issues on appeal: (1) whether at step three the ALJ erred in finding Plaintiff's impairments not of listing-level severity, and (2) whether the ALJ properly determined Plaintiff's residual functional capacity [*see* Dkt. 19]. Core to each of these issues, Plaintiff argues, is the underlying question of whether the ALJ failed to give proper weight to Plaintiff's treating and nonexamining physicians. *Id.* at 4, 9. The Court considers this underlying issue as a threshold matter.

## I.     THE ALJ FAILED TO GIVE PHYSICIAN OPINIONS PROPER WEIGHT

Plaintiff argues that the ALJ "disregard[ed] all the doctors' opinions" and that the ALJ impermissibly "play[ed] doctor" in making his step three and residual functional capacity determinations. *Id.* at 4,8. The Commissioner argues in response that the ALJ simply weighed the evidence on the record and properly recorded his reasons for giving each discredited opinion

little weight [Dkt. 22 at 6-7]. Though Plaintiff acknowledges the ALJ's authority ultimately to decide a claimant's residual functional capacity or disability status, Plaintiff points out that the Commissioner still must support such decisions with substantial evidence, and asserts that the ALJ here failed to meet this burden [Dkt. 19 at 8].

Here, the ALJ gave "little weight" to the following physicians: (1) Drs. Sullivan and Miller (nonexamining sources), (2) Dr. Ferguson (nonexamining source), (3) Dr. Gilliland (nonexamining source), (4) Dr. Ludden (nontreating source), (5) Dr. Mount (nontreating source), (6) Dr. Kwun (nonexamining source), and (7) Dr. Phillips (treating source) [TR at 19-21]. Because the standards for determining the proper weight due such opinions depends primarily upon the nature and extent of the source's relationship with the claimant, 20 C.F.R. § 404.1527(c); *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000), the Court evaluates the ALJ's decision to discredit each physician in the context of that physician's relationship with Plaintiff. *See also* 20 C.F.R. § 404.1527(a)-(b), (d)-(e) (providing that the Commissioner "will always consider the medical opinions in [the] record together with the rest of the relevant evidence" in making a disability determination). Importantly, the ALJ's decision "must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton*, 209 F.3d at 456. The Court considers Plaintiff's contentions first with regard to Dr. Phillips (treating source), then with regard to Drs. Ludden and Mount (nontreating sources) and Dr. Ferguson (nonexamining source).[8]

---

[8] The ALJ accorded the opinions of Drs. Sullivan, Miller, Gilliland, and Kwun little weight because, *inter alia*, he found certain of Plaintiff's impairments to be "severe" that these physicians found to be "non-severe" [TR 19-21]. Whether or not the ALJ made the appropriate determination in this regard, his decision clearly does not prejudice Plaintiff. *See Goode v. Apfel*, No. Civ. A. 3:98-cv-2693-D, 1999 WL 451287, at *4 (N.D. Tex. June 29, 1999) (finding that the ALJ's determination that claimant "could perform only light work" despite that a reviewing physician's opinion that the claimant "could perform medium work" did not prejudice the claimant) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). Accordingly, the ALJ's decision to give Drs. Sullivan, Miller, Gilliland, and Kwun little weight does not constitute reversible error, at least as to the severity of Plaintiff's impairments. *Id.*

## A. Treating Source (Dr. Phillips)

The treating physician (or treating source) rule provides that a treating source's opinion is entitled to great weight. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citing *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995)). Pursuant to this rule, an ALJ must give a treating source's opinion regarding the severity and nature of a plaintiff's impairment "controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'" *Id.* (quoting *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995) (in turn citing 20 C.F.R. § 404.1527(d)(2))).[9] Nevertheless, the Fifth Circuit in *Newton* noted that certain circumstances would justify an ALJ's giving less weight to a treating source's opinion:

> Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. [T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion. The treating physician's opinions are not conclusive. The opinions may be assigned little or no weight when good cause is shown. Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.

209 F.3d at 455-56 (internal citations and quotation marks omitted). The relevant regulations touch on this good cause carve-out, as well, providing that the Commissioner "will always give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2). The Fifth Circuit has indicated that the

---

[9] 20 C.F.R. § 404.1527 has been revised several times since the Fifth Circuit's opinions in *Newton* and in *Martinez* such that those courts' references to subsection (d)(2) refer to the factors now found at subsection (c)(2) of 20 C.F.R. § 404.1527. *Compare* 20 C.F.R. § 404.1527 (effective to July 31, 2006), *with* 20 C.F.R. § 404.1527 (August 24, 2012).

Commissioner meets this good cause requirement where the ALJ relies on "reliable medical evidence from a treating or examining physician controverting the claimant's treating [source]" in according the claimant's treating source less than controlling weight. *See Newton*, 209 F.3d at 453; *Rollins v. Astrue*, 464 F. App'x 353, 358 (5th Cir. 2012) (per curiam) (finding that ALJ had good cause to reject treating source's opinion where other physicians' opinions on the record contradicted the treating source's opinion and the objective medical evidence supported the ALJ's determination).

Where the Commissioner fails to demonstrate good cause and yet the ALJ determines a treating source's opinion should receive less than controlling weight, 20 C.F.R. § 404.1527(c)(2) prescribes a six-factor analysis for determining the weight the treating source's opinion should be accorded. *See Newton*, 209 F.3d at 456 (holding that, in absence of good cause, the six-factor analysis is mandatory). Specifically, the ALJ must consider the following "*Newton* Factors":

> (1) the [source's] length of treatment of the claimant,
> (2) the [source's] frequency of examination,
> (3) the nature and extent of the treatment relationship,
> (4) the support of the [source's] opinion afforded by the medical evidence of record,
> (5) the consistency of the opinion with the record as a whole; and
> (6) the specialization of the [source].

*Id.* (citing 20 C.F.R. § 404.1527 and Social Security Ruling 96-2p). In determining whether an ALJ properly analyzed the *Newton* factors, courts in the Fifth Circuit have generally required the ALJ to demonstrate awareness of the relevant regulation and to consider expressly (or implicitly) each of the prescribed factors. *See, e.g.*, *Brown v. Apfel*, 192 F.3d 492, 500 (5th Cir. 1999) (upholding lower court's finding that ALJ's opinion was supported by substantial evidence despite that the ALJ chose to disregard a treating source's opinion where "every other doctor [the claimant] consulted and objective medical test [the claimant] underwent indicated that [the claimant] had no . . . basis for her . . . complaint"); *Leggett v. Chater*, 67 F.3d 558, 566 (5th

Cir.1995) (finding the ALJ gave treating source's opinions proper—and little—weight where "earlier opinions of the treating physicians, the objective medical evidence, and [the claimant's] own testimony regarding his physical abilities" were contrary to the source's opinion); *Smith v. Colvin*, No. 1:14CV195-SA-DAS, 2016 WL 762693, at *9-15 (N.D. Miss. Feb. 25, 2016) (finding reversible error where ALJ's determination that a treating source's opinion was due little weight was unsubstantiated by the record as a whole); *Guerra v. Colvin*, Civil Action No. M-15-038, 2016 WL 1166337, at *5-6 (S.D. Tex. Feb. 5, 2016) (finding ALJ's failure to consider all of the § 404.1527(c)(2) factors harmless error because, on independent review, the Court found the opinion conclusory in nature and unsupported by the record); *Chess v. Astrue*, No. Civ.A. H-10-0607, 2011 WL 11048249, at *4-5 (S.D. Tex. Feb. 2, 2011) (finding ALJ's six-factor analysis sufficient where the "ALJ carefully went through each of the factors in his assessment" and "carefully went through each treatment record from [the treating source]"); *Patino v. Colvin*, No. 3:15-cv-618-BF, 2016 WL 1664912, at *7 (N.D. Tex. Apr. 25, 2016) (finding reversible error where ALJ considered "some of the Section 404.1527(c) factors, [but] . . . omit[ted] others"); *Bentley v. Colvin*, No. 13-CV-4238-P, 2015 WL 583029, at *9-10 (N.D. Tex. Sept. 30, 2015) (observing that ALJ considered only one of the required *Newton* Factors but finding harmless error); *Cox v. Astrue*, No. CivA.7:07057BF(R), 2008 WL 4936388, at *9 (N.D. Tex. Nov. 18, 2008) (finding reversible error where ALJ relied solely on the claimant's statements and a remote opinion—one made eight months after the treating source's opinion—that contradicted a treating source's opinion).

In the present case, the ALJ demonstrates no good cause for disregarding Dr. Phillips's opinion and fails to conduct the requisite *Newton* Factor analysis [*see* TR 21].  As noted, Dr. Phillips treated Plaintiff for over two years, *id.* at 744-49; and during the course of treatment, Dr.

Phillips noted Plaintiff's fatigue, depression, and lack of motivation, as well as the various attempts to remedy Plaintiff's maladies with prescription drugs. *Id.* at 745, 748. Dr. Phillips collects clinical observations from May 2010 into late October 2012 documenting Plaintiff's depression before concluding in December 2012 that Plaintiff is "severely depressed" and suffers from other serious impairments, which together leave Plaintiff "unable to perform even minimal duties of a job for any extended period of time." *Id.* at 749.

The ALJ nevertheless disputes Dr. Phillips's opinion that Plaintiff is unable to work and points to three separate records to substantiate such dispute. *Id.* at 21. First, the ALJ notes that because Dr. Munoz (in December 2009) observed that Plaintiff had normal gait, station, and muscle tone, Dr. Phillips's opinions (from December 2012, three years later) must be inaccurate. *Id.* The ALJ next cites Dr. Ludden's clinical observation that Plaintiff presented with normal affect in November 2011, notwithstanding that, elsewhere in his determination of disability, the ALJ discounts Dr. Ludden's observations because the ALJ believes her prognosis is inconsistent with her clinical observations. *Id.* at 20-21. The ALJ also references records from Plaintiff's 2010 hospitalization, which, like Dr. Munoz's opinion, predate Dr. Phillips's opinion by two years. *Id.* at 21. Finally, the ALJ considers Plaintiff's own statements regarding her daily living that appear contrary to Dr. Phillips's opinion that Plaintiff should not be working. *Id.*

In light of the record as a whole, the ALJ had no good cause to disregard or give little weight to Dr. Phillips's opinion, as no "reliable medical evidence from a treating or examining physician controverting" Dr. Phillips's opinion exists in the record. *See Newton*, 209 F.3d at 453. As to other treating sources, Dr. Bannister's opinions generally support Dr. Phillips's opinions [*see* TR 383-413]. Despite that during her last meeting with Plaintiff, Dr. Bannister noted that Plaintiff "now feels brighter about things[,]" Dr. Bannister's records indicate that

Plaintiff's depression waxed and waned throughout 2009 and into mid-2010. *Id.* Dr. Bannister's records also indicate that Plaintiff still was prescribed Lexapro during this last meeting. *Id.* at 414. The ALJ never discussed how Dr. Bannister's records, which are contemporaneous with some of the records he used to discount Dr. Phillips's opinion, weighed in his analysis and the Court cannot now reweigh the evidence. *See Shields v. Commissioner*, No. 6:08-cv-00484-MHS-JKG, 2008 WL 8141300, at *11-12 (E.D. Tex. Dec. 16, 2008). Instead the ALJ points to Dr. Munoz's opinion (from late 2009) that Plaintiff has "no depression, anxiety, or agitation[,]" to discount Dr. Phillips's opinion (from late 2012) to the contrary [TR 21]. *See Cox*, 2008 WL 4936388, at *9. The ALJ then references Dr. Ludden's observation (from November 2011) that Plaintiff's affect was normal, but fails to account for Dr. Ludden's opinion that Plaintiff's prognosis was poor or for Dr. Mount's observations and conclusions to the same effect [TR 20-21]. *See Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985) ("[The Court] must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." (citations omitted)). The ALJ's reference to the Methodist Richardson records (from 2010), which reflect Methodist Richardson's observation that Plaintiff was "awake, alert and cooperative with an affect that is calm[,]" [TR 461-62] neglects context: Plaintiff had just wrecked her car and was visiting the emergency room, yet the ALJ relies on this record as if the observation were made during a typical visit to the doctor's office, *see id.* at 20-21. In light of the foregoing, the ALJ fails to provide good cause for giving Dr. Philllips's opinion little weight. Because the ALJ provided no good cause for so doing, the Court must determine whether the ALJ considered the *Newton* Factors in determining the weight he accorded Dr. Phillips's opinion. *Newton*, 209 F.3d at 453.

Though the ALJ properly references 20 C.F.R. § 404.1527(c)(2) in his opinion and compared other medical observations and opinions in the record against Dr. Phillips's opinion, the ALJ omitted consideration of the length of the treating relationship, the frequency of examination, the nature and extent of the treating relationship, Dr. Phillips's specialization, and, to some extent, the supportability of Dr. Phillips's opinion (in light of Dr. Phillips's own clinic observations and the record as a whole) [TR at 15-21]. Dr. Phillips's opinions do not contradict "every other doctor"; instead, his opinions find support in Dr. Ludden's clinical observations and prognosis for Plaintiff from a year earlier, as well as in Dr. Mount's nearly contemporaneous evaluation and clinical observations of Plaintiff. *See Brown*, 192 F.3d at 500; *Cox*, 2008 WL 4936388, at *9. Further, Dr. Phillips's opinion is consistent with his own previous clinical observations over the course of two and one half years of treating Plaintiff. *See Leggett*, 67 F.3d at 566. The ALJ disregarded these facts and otherwise failed to consider the prescribed *Newton* Factors with regard to Dr. Phillips's opinions.

### B.    *Nontreating Sources (Drs. Ludden and Mount) and Nonexamining Source*

Although nontreating and nonexamining sources are due less deference than treating sources, an ALJ must provide "good reason" for discounting such sources' opinions. 20 C.F.R. § 404.1527(c). An ALJ should consider the following factors in determining "the weight [to] give any medical opinion": (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) "other factors"—those items brought to the ALJ's attention that "tend to support or contradict the opinion." *Id.*

Here, the ALJ decided to give the opinions of Drs. Ludden and Mount little weight [TR 14, 20-21]. But, as discussed *supra* with regard to Dr. Phillips, the ALJ provides little sound reason for these determinations. The ALJ commits the same errors with regard to Dr. Mount as

he did with regard to Dr. Phillips, namely that he pits Dr. Mount's late-2012 opinion against either consistent or remote opinions and then concludes that Dr. Mount's opinions are due little weight. *Id.* at 21. The ALJ asserts that Dr. Mount's opinion that Plaintiff's impairments do meet listing-level severity are inconsistent with Dr. Bannister's (remote) April 6, 2010 observation that Plaintiff had "stable affect with good eye contact." *Id.* at 21, 413. He also points to Dr. Ludden's (more contemporaneous) observation that Plaintiff "ha[d] a good fund of knowledge" and an "intact" memory, but disregards Dr. Ludden's conclusions that Plaintiff's prognosis is poor. *Id.* at 21, 658-59. And the ALJ argues that Dr. Mount's opinion is inconsistent with Dr. Mount's own observation that Plaintiff could perform concentration tests well. *Id.* at 21, 711.

Further, with regard to Dr. Ludden, the ALJ concludes summarily that Dr. Ludden's own clinical observations—that Plaintiff's "thought process [was] logical and goal-oriented," that Plaintiff "denied any delusional thoughts, excessive anxiety, phobias, obsessive thoughts, suicidal ideation, and auditory and visual hallucinations[,]" among others—do not support her opinion that Plaintiff's "prognosis is poor." *See id.* at 20, 659. Although the Court does not reweigh the evidence and recognizes that the Commissioner ultimately determines disability and other administratively dispositive issues, an ALJ may not play doctor where the ALJ sees what the ALJ believes are internal inconsistencies in a medical expert's opinion. *See Lambert v. Astrue*, No. 1:10CV141-SAA, 2011 WL 248090, at *4 (noting that the Commissioner's regulations indicate that "additional evidence will be sought . . . when the report from [a] medical source contains conflict or ambiguity that must be resolved").

By contrast, the ALJ's determination that nonexamining physician Dr. Ferguson's opinion is due little weight [TR 20] should stand. As the ALJ discusses, Dr. Ferguson opines that Plaintiff's impairments are "not severe," but then proceeds to evaluate Plaintiff's

impairments as if they were severe to determine whether they meet listing-level severity. *Id.* at 20. This inconsistency falls within the ALJ's ambit of review: the determination is not a medical one, but rather one of administratively dispositive fact. *See* 20 C.F.R. § 404.1527(d).

## II. THE ALJ'S FAILURE TO PROPERLY WEIGH PHYSICIAN OPINIONS PREJUDICED PLAINTIFF

Plaintiff argues that the ALJ's failure to properly weigh the medical opinions on the record prejudiced Plaintiff at step three of the ALJ's analysis and beyond [Dkt. 19 at 7, 9]. Commissioner asserts that the ALJ properly weighed the medical opinions on the record and supported his disability determination with substantial evidence [Dkt. 22 at 5-7, 12-15].

Because "[p]rocedural perfection in administrative proceedings is not required[,]" the reviewing court should remand for the ALJ's failure to demonstrate good cause or conduct the six-factor analysis only where "the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *see Audler v. Astrue*, 501 F.3d 448, 448 (5th Cir. 2007) (remanding where claimant "submitted a diagnostic checklist from her treating physician" demonstrating that one of claimant's alleged impairments was of listing level severity and the ALJ had failed to discuss this evidence in denying disability benefits). Further, "the [Commissioner] . . . has the duty to weigh the evidence, resolve material conflicts . . . , and decide the case." *Johnson v. Bowen*, 864 F.2d 340, 347 (5th Cir. 1988). Nevertheless, where "the Court is unable to say what the ALJ would have done had he weighed all relevant evidence of record[,]" the ALJ's decision "is not supported by substantial evidence" and should be remanded for reversible error. *See Patino*, 2016 WL 1664912, at *7; *Gerken v. Colvin*, No. 3:13-cv-1586-BG, 2014 WL 840039, at *7 (N.D. Tex. Mar. 4, 2014) (explaining that this requirement arises out of "the ALJ's responsibility to weigh the evidence"); *cf. January v. Astrue*, 400 F.

App'x 929, 932-33 (5th Cir. 2010) (per curiam) (implying remand is appropriate where a "realistic possibility" exists that "absent the error, the ALJ would have reached a difference conclusion" (internal quotations omitted)).

As discussed *supra*, the ALJ provided deficient explanation for according the opinions of Drs. Phillips, Ludden, and Mount little weight. In light of the facts that (1) each of these sources provided medical opinions contrary to the ALJ's determinations at step three and of Plaintiff's residual functional capacity and (2) the ALJ gave these opinions little (or no) weight, the Court cannot discern "what the ALJ would have done had he weighed all relevant evidence of record." *Patino*, 2016 WL 1664912, at *7; *see Gerken*, 2014 WL 840039, at *7. Had the ALJ properly considered these opinions, the ALJ could have concluded that Plaintiff was disabled at either of those points of the sequential analysis. *See January*, 400 F. App'x at 932-22. The ALJ accordingly fails to provide substantial evidence in support of his determination. *Gerken*, 2014 WL 840039, at *7. This constitutes prejudice and thus is reversible error. *See Patino*, 2016 WL 1664912, at *7; *see Gerken*, 2014 WL 840039, at *7.

## CONCLUSION

The ALJ determined that the opinions of Drs. Phillips, Ludden, and Mount were due "little weight" without following the prescribed analysis and in absence of reliable medical source controverting those opinions; the ALJ's decision is not, therefore, supported by substantial evidence. Accordingly, the Commissioner's decision should be reversed and the case remanded for further proceedings consistent with this opinion and applicable law. The Commissioner should either reweigh the opinions of Drs. Phillips, Ludden, and Mount under the prescribed factors or accord them the weight due by default under the Commissioner's regulations and other applicable law.

Pursuant to the foregoing, the decision of the Commissioner is **REMANDED** for further proceedings consistent with this opinion.

**Sep 30, 2016**

_____

Christine A. Nowak
UNITED STATES MAGISTRATE JUDGE